## Gunn & Company v. Monarch Coal & Coke Company.

(Decided December 19, 1924.)

Appeal from Bell Circuit Court.

Mines and Minerals—Purchase of Coal by Coal Mining Company Not Ultra Vires—"Merchandise."—Under charter of coal mining company, stating its objects and purposes, among others, "to buy and sell merchandise of every description," the purchase of two cars of coal was not ultra vires, as "merchandise" usually means personalty used by merchants in course of trade, but may include every article of traffic.

JOHN HOWARD, SAMUEL M. WILSON and WILSON & HARBISON for appellant.

T. G. ANDERSON and H. C. FAULKNER for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

On August 9, 1916, the Monarch Coal and Coke Company, a corporation, entered into a contract by which it agreed to furnish the Lower Hignite Coal Mining Company, another corporation, two cars of nut and slack coal per week until April 1, 1917, at the price of 80 cents per ton, f. o. b. mines. The Monarch Coal and Coke Company furnished only a small quantity of the coal and failed and refused to furnish the balance. In the year 1920, W. E. Gunn & Company became the owner of all the property of the Lower Hignite Coal Mining Company, including all choses in action and debts due the company. In the year 1921, this action was brought by W. E. Gunn & Company to recover damages for breach of the contract. One of the defenses interposed was that the contract was *ultra vires,* and not being binding on the Lower Hignite Coal Mining Company, was not binding on the Monarch Coal and Coke Company. At the conclusion of the evidence the trial court directed the jury to find for the defendant, and W. E. Gunn & Company have appealed.

We have carefully examined the evidence on the question of damage, and, while not as definite and specific as it might have been, it was sufficient to show some damage, and therefore to take the case to the jury. It therefore follows that the peremptory was improper unless the court was right in its conclusion that the contract was *ultra vires,* a question which depends on the con-

struction of article III of the charter of the Lower Hig-
nite Coal Mining Company, which reads as follows:

"The nature of the business and objects or pur-
poses proposed to be transacted and carried on shall
be to purchase, own and lease real estate, mineral
and timber lands and rights, to sell, develop and
operate the same, to mine coal and all other minerals,
to manufacture coke, quarry stone, and transport
and dispose of the same and their products, to pur-
chase, sell, acquire, build, own and lease houses, to
erect elevators, for storing coal for wholesale or
retail, to buy and sell merchandise of every descrip-
tion, and produce, at wholesale or retail, to build
coke ovens and by-products plants and operate the
same, to build roads and tramways, to develop and
improve lands and mines and construct, maintain
and operate oil and gas well and pipe lines for con-
veying, transporting, and delivering oil or gas or
both of them, to bore, prospect and operate for
petroleum, natural gas and salt water and to trans-
port and dispose of the product thereof, to build
and operate railroads as authorized by section 815
of the Kentucky Statutes, to own, build and op-
erate saw mill and all other equipments necessary,
to own, manufacture and sell timber and the products
of same, and to do everything else that may be di-
rectly or indirectly conducive to any of the objects
of the company, as well as to contribute to, subsidize,
or otherwise aid or take part in any such opera-
tions."

The argument in support of the court's ruling is
that the Lower Hignite Coal Mining Company was simply
a mining company with power to acquire property for
mining purposes, and to dispose of the product mined.
To sustain this position we are cited to authorities hold-
ing that a corporation organized for the purpose of man-
ufacture along a particular line, and for the sale of the
manufactured product, can not, in general, enter into
contracts for the agency and sale of products of other
manufacturing corporations.   Thompson on ·Corpora-
tions, volume 3, section 2814; Com. v. Thackara, 156 Pa.
510; Day v. Spiral, 57 Mich. 146; Bosshardt v. Crescent
Oil Company, 171 Pa. 109. It is further insisted that the
company can not justify under the power "to buy and
sell merchandise of every description," as the word mer--

chandise is not broad enough to include coal, and the power was given for the sole purpose of enabling the company to furnish its employes with such merchandise as they might desire.

It may be that one of the purposes of the power was to enable the company to conduct a commissary, but there is no such restriction in the language employed, and we can not give it such a narrow meaning without doing violence to the words used. The word "merchandise" has a very extended meaning, and usually means personalty used by merchants in the course of trade, but may include every article of traffic. Mara v. Branch (Tex.), 135 S. W. 661; Whitewater Mercantile Co. v. Devore, 109 S. W. 808, 130 Mo. App. 339. In H. H. Kohlsaat & Co. v. O'Connell, 255 Ill. 271, 99 N. E. 689, "merchandise" is defined as anything movable, customarily bought and sold for profit. Here, the charter did not stop with the words, "to buy and sell merchandise," but added the words, "of every description," thus showing a clear purpose to use the word "merchandise" in its broadest possible sense. Therefore, it is just as unreasonable to say that it does not include sugar, coffee, nails or shovels, as to say that it does not include coal. There is nothing in Dyott v. Letcher, &c., 6 J. J. Marsh. 541, that conflicts with this view. There the court had under consideration a statute that provided that all actions or suits founded upon accounts for goods, wares or merchandise, sold and delivered, or for any article charged in any store account, should be commenced within 12 months next after the delivery of such goods, wares and merchandise. In discussing the question the court said:

"Those articles only, which are sold or kept for sale by a merchant, can be properly denominated goods, wares, and merchandise. That which, if sold by a merchant, in the course of his business as such, may, with propriety, be termed merchandise, could not be truly so styled, if sold by a farmer. The linsey or linen of a farmer, which he sells, are not merchandise; nor does a lapse of twelve months, from the time of such sale, until suit instituted, bar his right to recover the value or price of them in an action of assumpsit. But should a merchant buy them, and again vend them, or keep them for sale, in the course of his mercantile pursuits, they would be

merchandise; and the bar provided by the 5th section of the act referred to, would apply to his demand for the price of them, in an action of assumpsit, on an account, if twelve months from the delivery of such goods, &c., should elapse previous to the institution of the suit.''

It is at once apparent that the only effect of this decision is that only those articles which are sold or kept for sale by a merchant are merchandise within the meaning of the statute of limitations and that the statute has no application to articles sold by persons who are not merchants. Having this view of the question, it results that the trial court erred in directing a verdict in favor of appellee.

Judgment reversed and cause remanded for a new trial consistent with this opinion.